Frank Meyer, Appellant, v. Riverview Park Company, Appellee.

Gen. No. 45,173.

Opinion filed December 12, 1950.   Released for publication January 17, 1951.

FRED A. GARIEPY, of Chicago, for appellant; JOHN SPALDING, of Chicago, of counsel.

STANLEY L. SHETLER, of Chicago, for appellee.

MR. PRESIDING JUSTICE SCHWARTZ delivered the opinion of the court.

The complaint originally consisted of three counts. The first count charged assault by one Bradley, originally impleaded with defendant. The second count was a charge against defendant under the Dram Shop Act [Ill. Rev. Stat. 1949, ch. 43, par. 94 *et seq.*; Jones Ill. Stats. Ann. 68.001 *et seq.*]. The third count charged that plaintiff was a passenger on a conveyance operated by defendant as a common carrier; that defendant had the duty to exercise the highest degree of care to protect him, and that it negligently permitted him to be assaulted by Bradley.   Count II was withdrawn by plaintiff during trial.   The case went to the jury on

Counts I and III. The jury brought in a verdict for $500 against Bradley and $4,000 against Riverview Park. The suit was thereafter dismissed against Bradley. Defendant moved for judgment *non obstante veredicto* and in the alternative, for a new trial. The court sustained the motion, and from the judgment so entered, plaintiff appeals.

Plaintiff, his wife and children and some relatives were patrons at Riverview Park on the night in question. The family all tried to get into the "Bobs," a pleasure ride of the kind common in such parks. There being no room for plaintiff's wife, plaintiff asked the attendant to hold a seat for her on the next ride around. Shortly, they were back at the loading platform and plaintiff's wife was waiting for him. Bradley and a friend were also waiting, and Bradley tried to get the seat being held for the wife, but plaintiff put his arm over the seat, blocking it. His wife crawled over the "arm of the ride" and the ride started pulling away. As it did so, Bradley hit plaintiff with a kewpie doll, breaking the doll. It does not appear that this incident was taken seriously by plaintiff or defendant's servants. The ride completed, plaintiff got off at the unloading platform and walked down a ramp to a corner near the exit. He says, "When I came down and started to go into the park, he came down. By 'he' I mean Bradley, the colored man. He came to the gate, that is, to the fence with the other colored boy and he said, 'Come and get me,' and he called me a dirty name. I did not hear what he said at first and I stood by the fence to hear what he said. I said 'What did you say?' and he repeated it. I was leaning on the fence with my arm and he swings at me, caught me around the neck and pulled me over the fence. My arm was on my stomach as I was leaning on it. I did not go over the fence on my own power by jumping over it. He swung me over by the neck. I went over the fence

220

and fell over on my face.'' Bradley had a knife, and in the melee, cut up the plaintiff. Bradley weighed 145 to 150 pounds and plaintiff weighed 213 pounds. There is a controversy over the precise point at which the fight occurred. Plaintiff testified that the fence between him and Bradley was four feet high. Defendant, on the other hand, contends that it must have occurred at a place where there is a fence six feet high. The trial court thought plaintiff's story unworthy of belief. It seems beyond credence that a 213 pound man could be swung by the neck over a fence four feet high by a man weighing 145 to 150 pounds, who, it is claimed was intoxicated. Perhaps Bradley was experienced in the art of jujitsu. For the purpose of this case, we accept plaintiff's version. The essence of plaintiff's case is that after defendant had been put on notice by Bradley's hitting plaintiff with the kewpie doll, it was defendant's duty to protect plaintiff against Bradley, and if it had performed its duty as a common carrier, plaintiff would not have been injured.

The controlling case is *Neering v. Illinois Cent. R. Co.*, 383 Ill. 366, which states the law applicable to the facts in this case so clearly and succinctly, that there is no occasion to consider any other. There, plaintiff, a waitress, was in the habit of taking the I. C. train at Riverdale at 4:59 a.m. to go to work. Hoboes and tramps had on several occasions gone to sleep in the warming house provided by defendant for the use of patrons, and often, hoboes walked the right of way. Plaintiff and her sister both made complaint to the ticket agent about this. On the morning in question, plaintiff went into the warming house and while seated there, a hobo assaulted her. The court said, ''It is conceded that plaintiff was a passenger after arriving on the station platform and that defendant owed her the duty of ordinary care. The rule requiring the

highest degree of care . . . applies only to the operation of trains and immediate incidents of transportation, and as to station buildings and other appurtenances the carrier is required to exercise only ordinary care. . . ."

██ We have read the pleadings in the *Neering* case. The complaint charged that defendant had knowledge of the dangerous condition; that plaintiff had notified defendant of the dangerous condition and sought protection and that defendant carelessly and negligently failed to take the necessary steps to protect plaintiff. From a careful examination of the opinion in the *Neering* case, we conclude that as a prerequisite of liability in a case such as this, the following must be shown: (1) that there was danger of assault on plaintiff; (2) that defendant had notice of that danger and should reasonably have anticipated it; (3) that defendant failed to use due care to guard plaintiff against that assault; and (4) that plaintiff himself exercised due care to avoid such assault.

██ It appears from the evidence that plaintiff upon hearing Bradley's threats made to him from the opposite side of the fence, stopped "to hear what he said" and in fact, asked him "What did you say?" This is clearly not the conduct of a man who felt he was in danger. In other words, he did not anticipate any danger to himself, or felt if there was any, he could take care of it himself. Bradley would not have been able to get his hands on plaintiff unless he had deliberately put himself in position to enable Bradley to pull him over the fence. Plaintiff voluntarily and deliberately took that position. If we assume that he did anticipate danger, then it was his duty to see one of the defendant's agents and ask for protection. The fact remains that plaintiff now insists that defendant should have anticipated for him what he, apparently, could not anticipate for himself and should have kept

him from a dangerous situation which he, by stopping to have Bradley repeat his insulting remarks, made possible. Plaintiff argues that the fact that Bradley had hit him on the head with a kewpie doll was sufficient to put defendant on notice that there was danger. It does not appear from the record how serious this first assault was. What does appear is that plaintiff himself did not consider it worthy of sufficient notice to keep away from Bradley and to require from defendant's servants that protection which seems to have occurred to him as being necessary only after the event. Of course, the evidence offered on behalf of defendant controverted the testimony which we have heretofore outlined. However, we have accepted the most favorable evidence offered on plaintiff's behalf, together with whatever reasonable intendments could be made therefrom to sustain plaintiff's case. Even so, we are of the opinion that the court properly allowed the motion for judgment *non obstante veredicto*.

*Judgment affirmed.*

FRIEND and SCANLAN, JJ., concur.